AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Oregon

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>White iPhone 12 mini with a clear and blue perimeter<br>bearing International Mobile Equipment Identity (IMEI)<br>353008113292516 case as described in Attachment A | )<br>)<br>)<br>)  Case No.  6:24-mc- 1254<br>)         Amended<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Oregon _____
*(identify the person or describe the property to be searched and give its location)*:

As described in Attachment A hereto, which is incorporated by reference herein.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

The information and items set forth in Attachment B hereto.

**YOU ARE COMMANDED** to execute this warrant on or before _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     U.S. Magistrate Judge Andrew D. Hallman, via Clerk     .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     December 6, 2024 at 2:38 _____     *Andrew Hallman*
_____
*Judge's signature*

City and state:        Eugene, Oregon _____     Andrew D. Hallman, United States Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br> 6:24-mc-1254 Amended | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

DISTRICT OF OREGON, ss:          AFFIDAVIT OF ANTHONY ALCOBIA

**Affidavit in Support of an Application Under Rule 41
for a Warrant to Search and Seize Evidence Including Digital Evidence**

I, Anthony Alcobia, being duly sworn, do hereby depose and state as follows:

**Introduction and Agent Background**

1.      I have been employed as a Special Agent (SA) with Homeland Security Investigations (HSI) since January 2019.   I am currently assigned to work out of the Deschutes County Digital Forensics Lab (DFL) and, specifically, tasked to investigate violation of laws linked to Internet Crimes Against Children (ICAC) for HSI Bend.   The DFL includes members of the Deschutes County Sheriff's Department, Bend Police Department, Redmond Police Department, Oregon Department of Justice, Federal Bureau of Investigation, Oregon State Police, U.S. Marshals, U.S. Attorney's Office and the Deschutes District Attorney's Office.   As a HSI SA, I investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal production, distribution, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2251 and 2252.   I have been a full-time ICAC investigator since September 2022.   I have participated in the service of numerous search warrants involving child exploitation and/or child pornography offenses and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in various forms of media.   Additionally, I have been a certified ICAC Undercover (UC) Chat Special Agent since May 2022. I have participated in online undercover communications using multiple social media messaging platforms.   In my undercover role, I have communicated with numerous suspected and identified adults interested in having illegal

**Affidavit of Anthony Alcobia**                                                                 **Page  1**

sexual contact with a minor and the production, distribution, and receipt of child pornography aka Child Sexual Abuse Material (CSAM).   I have been the lead case agent for over 5 cases for suspects violating California law 664/288(a)- Attempted Lewd and Lascivious Acts with a Minor Child, 288.3(a) - Contacting a Minor for Sexual Purposes, 288.4(b) - Arranging a Meeting With a Minor For Lewd Purposes. I have participated in over 12 arrests of adults attempting to meet a minor for sex. I have also observed and reviewed numerous chat communications between actual minor victims and adults.

2.      I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search and examination of a White iPhone 12 mini with a clear and blue perimeter case, bearing International Mobile Equipment Identity (IMEI) 353008113292516 (hereinafter "**Device**"), which is currently stored, in law enforcement possession, at DFL, as described in Attachment A hereto, and the extraction of electronically stored information from the Device, as described in Attachment B hereto.   As set forth below, I have probable cause to believe and do believe that the items set forth in Attachment B constitute evidence, fruits, and instrumentalities of violations of *18 U.S.C §2251(a)* – Sexual Exploitation of Children and *18 U.S.C § 2422(b)* – Coercion and Enticement of a Minor, collectively referred to as the "**Target Offenses**," as described in Attachment B.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.   The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation,

**Affidavit of Anthony Alcobia**                                                                                    **Page 2**

communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

## Applicable Law

4.      *Title 18, United States Code, § 2251(a)* makes it a crime for any person to employ, use, persuade, induce, entice, or coerce any minor to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, if such person knows or has reason to know that the visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if the visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if the visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed

5.      *Title 18, United States Code § 2422(b)* makes it a crime for any person to use the mail or any facility or means of interstate or foreign commerce to knowingly persuade, induce, entice, or coerce any individual who has not attained the age of 18 years to engage in any sexual activity for which any person can be charged with a criminal offense, or to attempt to do so

## Statement of Probable Cause

6.      On December 3, 2024, I was informed by the Deschutes County Sheriff's Office (DCSO) regarding the arrest of Ernesto Perez TORRES.   In summary, a DCSO Deputy and certified undercover chatter, was conducting an online proactive undercover criminal investigation into the exploitation and solicitation of children on the internet.   This case began

**Affidavit of Anthony Alcobia**                                                                                   **Page 3**

with the establishment of an online undercover Facebook profile depicting a decoy minor, who appears to be a young female living in the Central Oregon area.   Your affiant notes that the profile itself lists the decoy minor's age as 60 years old, which is inconsistent with the appearance of the decoy minor in the profile pictures.   Based on my experience and discussions with the DCSO Deputy, this is a common practice used by actual minors to circumvent Facebook's parental controls.   The photographs used for this undercover profile were photographs of a female Deschutes County Sheriff Office employee (adult) who provided written consent and provided the DCSO Deputy a series of photographs for the investigation.   These photographs were altered with artificial intelligence (AI) to make the employee resemble a juvenile.

7.     On July 28, 2024, a subject, who was later identified as Ernesto Perez TORRES, began chatting with the DCSO Deputy on Facebook while they used the undercover persona of a 14-year-old girl (herein referred to as MV1).   TORRES messaged MV1 for the first time after his friend request was accepted. TORRES' Facebook profile was identified and later, TORRES was identified by way of law enforcement databases, which reflected TORRES is a registered sex offender following a conviction pursuant to ORS 163.427– Sexual Abuse 1st Degree, for which TORRES was sentenced to 75 months in custody.   A search of a Sex Offender registry showed TORRES' registration address in Madras, Oregon.

**Facebook Chat**

8.     TORRES' first message to MV1 was, "Hey how's it going, thanks for accepting my friend request. Hope your weekend went good" on July 28, 2024.   The two of them continued to share life information and have casual conversation.   On July 29, 2024, TORRES

**Affidavit of Anthony Alcobia**                                          **Page  4**

and MV1 talked about restaurant's and MV1 mentioned her mother. TORRES followed up by asking how old she was and she replied, "14 wbu (Smile emoji)." TORRES replied, "Oh shoot haha I was about to ask you if you wanted to go to that place sometime I'm 45 lol to old you don't look that young." Between July 29 and August 14, 2024, MV1 and TORRES have multiple casual conversations about each other's lives and how they spent their days. Within these are several statements in which TORRES revealed his understanding of MV1's age, including discussing school, parents, and MV1 being too young to drink alcohol. Between August 14, 2024, and August 30, 2024, TORRES and MV1 did not have any conversation until TORRES reached back out to MV1. On November 21, 2024, MV1 requested to switch to text messaging and TORRES agreed. TORRES provided his phone number. Communications with TORRES transitioned to text messaging.

## Text Messages

9.     When TORRES' phone number was inputted into a government issued iPhone, the contact information auto populated to "Nesto Torres" as the contact name and revealed a photograph matching those on TORRES' Facebook.

10.     On November 24, 2024, at 0022 hours, TORRES asked for a photograph of MV1 and she sent a video of her blowing a kiss. The following conversation followed:

**MV1**: Hehe (Smile Emoji)

**TORRES**: You're so beautiful (Heart eyes emoji)

**MV1**: Thank you (Heart Smile emoji x4)

**TORRES**: Nice lips, lovely hair, beautiful eyes.

**TORRES**: I imagine you're super hot too

**Affidavit of Anthony Alcobia**                                                                **Page 5**

**MV1**: You think so? (Mouth covered emoji)

**TORRES**: Yea I imagine so

**MV1**: I do like my body tbh (Smile emoji) ** TORRES hearted this**

**TORRES**: Wish I could see (Wink emoji)

**MV1**: Ohhh (Wink emoji x2, Heart smile emoji)

**TORRES**: You probably have a athletic body, so sexy

**MV1**: I do (Smile emoji) is that good?

**TORRES**: Yea, I think so.

**MV1**: Oh good (Face covered emoji x2) I'm kinda small tho

**TORRES**: Yea?

**MV1**: Yeah (Face covered emoji) little self conscious of it

**TORRES**: I don't think you should be

**MV1**: No? (Face covered emoji)

**TORRES**: I bet you look really nice

**MV1**: You do? (Heart smile emoji)

**TORRES**: I like it

**TORRES**: Wish I could see (Heart emoji)

**MV1**: Do you actually or are you just being nice (Face covered emoji)

**TORRES**: I would love to beautiful

**MV1**: Ohhh (Heart smile emoji x3) like what?

**TORRES**: What ever you like, I bet you're sexy all over

**MV1**: Kinda but I'm not gonna lie I'm very shy (Face covered emoji x2) especially in

**Affidavit of Anthony Alcobia**                                    **Page 6**

person (Face covered emoji x3)

**TORRES**: You shouldn't be, I bet you are a turn on

**MV1**: Why's that (Face covered emoji)

**TORRES**: Because I imagine you have a nice tight body, nice breasts hot ass, smooth skin (Heart emoji)

**TORRES**: And you say your small I like that

**MV1**: Mmmmmm (Smug smile emoji) I'm glad you do

**TORRES**: Maybe you can show me (Wink emoji)

**MV1**: Show you what (Mouth covered smile, Heart smile emoji)

**TORRES**: Nvm you don't have to

**MV1**: Ohh (Face covered emoji) I'm sorry

**MV1**: I didn't mean to make you mad (Face covered emoji) I'm just notsure if you mean what I think you mean (Smug smile emoji)

**TORRES**: No im not mad (Heart emoji)

**MV1**: U promise (Heart emoji) ?

**MV1**: I don't want to make you mad (Frown emoji)

**TORRES**: I meant your body but you don't have to if you're shy I just imagine your hot

MV1 followed up with a picture of her in a bikini tanning and then another of her in a hoodie. Shortly later TORRES said, "Send me a sexy pic gorgeous of you now (Wink emoji)." MV1 followed up with a picture of her torso with a t-shirt on.   The two say goodnight shortly after.

11.    On November 25, 2024, at 2118 hours, TORRES requested a picture of MV1 mid

**Affidavit of Anthony Alcobia**                                                                      **Page  7**

conversation.   MV1 sent a photograph with her hair in a towel drying.   TORRES followed up

by asking if she was naked and told her, among other things, she probably smelled good.

TORRES followed up by saying, "Send me a sexy pic yea?" after a short back and forth

conversation MV1 sent TORRES another photograph with her wearing a blue tank top and states

it has a little bit of cleavage then tells TORRES goodnight.

12.    On November 26, 2024, MV1 and TORRES chat casually throughout the day

until MV1 goes to bed at 2153 hours. At 2238 hours, TORRES sends a text to MV1 wishing she

was still awake. MV1 replied and asked if TORRES was okay.   Shortly later, TORRES told

MV1 he wished she was in his arms and the following conversation followed:

**MV1**: Meto I'd be snug (Heart smile emoji)

**TORRES**: Yea you would

**TORRES**: I want to give you kisses and hold you tight

**MV1**: Mmmmm, I want to receive your kisses (Heart smile emoji)

**TORRES**: I'd make you feel good (Heart emoji)

**TORRES**: (Kiss emoji)

**MV1**: Mmmmm (Heart eyes emoji)

**TORRES**: Yea baby

**MV1**: Tell me more (Heart eyes, Heart smile emoji)

**TORRES**: I'd kiss your neck and slowly kiss you down all over your beautiful body

**TORRES**: I bet you taste so good

**MV1**: Mmmmmm God (Heart eyes, Exhale emoji)

**TORRES**: Yea you like getting licked down there?

**TORRES**: I'm pretty good

**Affidavit of Anthony Alcobia**                                                              **Page 8**

**MV1**: Fuck I'm glad I woke up (Breath emoji) how good?

**TORRES**: Really good

**TORRES**: I'd make you moan so good

**TORRES**: Until you came

**MV1**: Fuck (Yell emoji x2)

**TORRES**: Send me a pic baby plz

**TORRES**: So I can sleep good tonight

**MV1**: Are you (OK emoji, egg plant emoji) rn?

**TORRES**: I like giving good head and I love getting head as well

**TORRES**: (*In reply to - Are you (OK emoji, egg plant emoji) rn?*) Hell Yes

**MV1**: Ohhh (Heart eyes emoji) and you like getting it? (Smirk emoji)

**TORRES**: Yea I bet you give good head baby

**MV1**: Depends on size (Face covered emoji)

**TORRES**: yea? Tell me

**TORRES**: Send me a pic baby so I can sleep good (Heart emoji)

**MV1**: Of which (Mouth covered emoji)

**TORRES**: Your pussy?

**TORRES**: (Face covered emoji)

**TORRES**: I'll eat it so good baby

**MV1**: ***Sends photograph in dress***

**MV1**: I still don't feel comfy with that being out there Willy Nilly. But here's me in a open skirt (smirk emoji)

**MV1**: (*In reply to – I'll eat it so good baby*) Promise?

**TORRES**: I promise don't be shy baby

**Affidavit of Anthony Alcobia**                                    **Page 9**

**TORRES**: - In reply to dress photograph – Beautiful

MV1 and TORRES messaged back and forth for a short while since MV1 would not send a nude photograph.   The following conversation followed:

**TORRES**: I'll make you feel good though

**MV1**: Will you (Water emoji)

**MV1**: (Yell emoji)? *

**TORRES**: I know it

**TORRES**: (Heart emoji)

**MV1**: I look forward to it then (Breath emoji)

**TORRES**: yea?

**TORRES**: I need you

**TORRES**: I want to hold you

**TORRES**: Send me a pic of you in bed at least

**TORRES**: I'll kiss your neck and anything you want so good, and lick you all over

**TORRES**: You're so beautiful

**TORRES**: Let me hear your voice

**TORRES**: are you mad at me for asking

**MV1**: No sorry I'm dozing off (Face covered emoji)

The two ended the conversation with goodnight messages.   In the morning, TORRES told MV1 he was sorry for last night and that he felt like he made MV1 uncomfortable.   MV1 assured him she was okay.   The two had casual conversation until November 30, 2024, whereafter TORRES began proposing a meeting.

13.     On November 30, 2024, at 2123 hours, TORRES messaged MV1 he was going to be in Redmond and wanted to meet and get coffee.   MV1 told him her mother left for work at

**Affidavit of Anthony Alcobia**                                                                                           **Page 10**

1900 hours so it would need to be after that.   MV1 later pointed out the Starbucks near her closes at 1900 hours but she was okay with getting food or something similar.   TORRES followed up by asking where a good location to meet up would be so MV1 recommended the Redmond Travel Center (401 NW Quince Ave, Redmond).   TORRES requested to call MV1 and she said she would have to wait until she was out of the car with her mother around 1800 hours.   At 1814 hours, another DCSO Deputy (who will also be referred to as MV1) agreed to speak with TORRES since she was a female . This conversation was recorded on a Body Worn Camera (BWC), which was summarized in a report that I have reviewed, though I have not yet reviewed the recording at this time

14.      During the recorded conversation, MV1 and TORRES spoke over the phone and had casual conversation about his pets and other topics.   Towards the end of the conversation TORRES mentioned his cabin and his father's cabin which, in past messages, he mentioned wanting to take MV1 to. MV1 asked if MV1 and TORRES were going to go to one of the cabins that night and TORRES said they'd go to his father's cabin in the area of Millikan, Oregon, which I know to be an area approximately 40 miles south of Redmond.   Prior to hanging up, TORRES told MV1 he would message her when he was heading out.

## Meet Up

15.      TORRES advised MV1 that he had a family issue on the night of November 30, 2024, and had to cancel. TORRES suggested meeting on December 1, 2024, and MV1 agreed. On December 1, 2024, TORRES and MV1 continued to converse, and the arrangement to meet still stood.   TORRES told MV1 he would be shopping in Redmond and could meet when he was done.   At 1708 hours, TORRES messaged MV1 that he was at Home Depot, which was located

**Affidavit of Anthony Alcobia**                                           **Page 11**

next door to the Redmond Travel Center.   MV1 told him she was still with her mom and was waiting for her to leave for work.   MV1 suggested getting tacos from Dylan's Mexican restaurant while he waited, and he agreed.   At 1759 hours, TORRES messaged MV1 that he was at the Redmond Travel Center.   Given TORRES' choice to act on these plans, taken with the chatting to that point, officers prepared to arrest TORRES.

16.     During the planned and executed arrest operation, DCSO discovered TORRES at the adjacent Home Depot and took TORRES into custody.   During the search incident to arrest, TORRES' cellphone (the **Device**) was discovered on his body.   During a post Miranda interview, TORRES stated he was unaware of MV1's age. TORRES was shown messages that showed he acknowledged her age, and various other conversations such as MV1 at school, not being able to drink, and being controlled by her mother, but TORRES still denied knowing MV1 was a minor.   Additionally, as an alternative explanation or defense, TORRES stated he did not think MV1 was a real person.

17.     TORRES admitted the White iPhone 12 mini with a clear and blue perimeter case, bearing International Mobile Equipment Identity (IMEI) 353008113292516 (**Device**) was used to message MV1.   The **Device** was seized in accordance with DCSO policy and by telephonic permission from the Honorable Judge Wells Ashby of the Deschutes County Circuit Court.

18.     The **Device** is currently in the lawful possession of the DCSO and located at the DFL, and has been since its seizure on December 1, 2024.   It came into the DCSO's possession following its discovery on TORRES' body during the search incident to arrest.

19.     The Device is currently in storage at DFL which is located at the DCSO in Bend, Oregon.   In my training and experience, I know that the Device has been stored in a manner in

**Affidavit of Anthony Alcobia**                                                    **Page  12**

which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the DCSO.

## Search and Seizure of Digital Data

20.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    *Wireless telephone*.   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.   These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.   Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.    *Digital camera*.   A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.   Digital cameras use a variety of fixed and removable storage media to store their recorded images.   Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage

**Affidavit of Anthony Alcobia**                                                                              **Page 13**

medium to a separate reader.   Removable storage media include various types of flash memory cards or miniature hard drives.   This storage media can contain any digital data, including data unrelated to photographs or videos.

        c.     *Portable media player*.   A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.   However, a portable media player can also store other digital data.   Some portable media players can use removable storage media.   Removable storage media include various types of flash memory cards or miniature hard drives.   This removable storage media can also store any digital data.   Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

        d.     *GPS*.   A GPS navigation device uses the Global Positioning System to display its current location.   It often contains historical records of the locations where it has been.   Some GPS navigation devices can give a user driving or walking directions to another location.   These devices can contain records of the addresses or locations involved in such navigation.   The Global Positioning System (generally abbreviated as "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.   Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.   These signals are sent by radio, using specifications that are publicly available.   A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude

**Affidavit of Anthony Alcobia**                                    **Page 14**

with a high level of precision.

e.     *PDA*.   A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs.   Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive email.   PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data.   Most PDAs run computer software, giving them many of the same capabilities as personal computers.   For example, PDA users can work with word-processing documents, spreadsheets, and presentations.   PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.     *Tablet*.   A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.   Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.   Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.   Apps can, for example, permit accessing the Web, sending and receiving email, and participating in Internet social networks.

g.     *Pager*.   A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.   Some pagers enable the user to send, as well as receive, text messages.

h.     *Storage medium*.   A storage medium is any physical object upon which

**Affidavit of Anthony Alcobia**                                                                 **Page 15**

computer data can be recorded.   Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

   i.  *IP address*.   An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.   Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.   Most Internet service providers control a range of IP addresses.   Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   j.  *Internet*.   The Internet is a global network of computers and other electronic devices that communicate with each other.   Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

21. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA**.**   In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

22. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.   This information can sometimes be recovered with forensics tools.

23. As further described in Attachment B, this application seeks permission to locate

**Affidavit of Anthony Alcobia**             **Page 16**

not only electronically stored information that might serve as direct evidence of the crimes described on the warrant but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.   There is probable cause to believe that this forensic electronic evidence will be on the Device because, based on my knowledge, training, and experience, I know:

a.     Data on the Device can provide evidence of a file that was once on the Device but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file or a text message)

b.     Forensic evidence on a device can also indicate who has used or controlled the device.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.   For example, registry information, configuration files, user profiles, email, email address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the device at a relevant time.   Further, forensic evidence on a device can show how and when the device was accessed or used.   Such "timeline" information allows the forensic analyst and investigators to understand the chronological context of access, use, and events relating to the crime under investigation.   This "timeline" information may tend to either inculpate or exculpate the device user.   Last, forensic evidence on a device may provide relevant insight into the device user's state of mind as it relates to the offense under investigation.   For example, information on a device may indicate the user's motive and intent to commit a crime (e.g., relevant web searches occurring before a crime indicating a plan to commit the same),

**Affidavit of Anthony Alcobia**                                                                 **Page  17**

consciousness of guilt (e.g., running a "wiping program" to destroy evidence on the device or password protecting or encrypting such evidence in an effort to conceal it from law enforcement), or knowledge that certain information is stored on a computer (e.g., logs indicating that the incriminating information was accessed with a particular program).

c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact electronically stored information on a storage medium necessary to draw an accurate conclusion is a dynamic process.   Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.   Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.   For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.    I know that when an individual uses an electronic device to commit a crime such as communicating with a minor over Facebook and text message for the purpose of child exploitation, the electronic device will generally serve both as an instrumentality for

**Affidavit of Anthony Alcobia**                                                                        **Page 18**

committing the crime and as a storage medium for evidence of the crime.   From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

24.     *Nature of examination*.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device to human inspection in order to determine whether it is evidence described by the warrant.

25.     The initial examination of the Device will be performed within a reasonable amount of time not to exceed 120 days from the date of execution of the warrant.   If the government needs additional time to conduct this review, it may seek an extension of the time period from the Court within the original 120-day period from the date of execution of the warrant.   The government shall complete this review within 180 days of the date of execution of the warrant.   If the government needs additional time to complete this review, it may seek an extension of the time period from the Court.

26.     If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on the Device or image do not contain any data falling within the scope of the warrant, they will not search or examine those files or folders further without authorization from the Court.   Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file

**Affidavit of Anthony Alcobia**                                                                                   **Page 19**

system, software application, etc., relating to files or data that fall within the scope of the warrant, through the conclusion of the case.

27.     If an examination is conducted, and it is determined that the Device does not contain any data falling within the ambit of the warrant, the government will return the Device to its owner within a reasonable period of time following the search and will seal any image of the Device, absent further authorization from the Court.

28.     If the Device contains evidence, fruits, contraband, or is an instrumentality of a crime, the government may retain the Device as evidence, fruits, contraband, or an instrumentality of a crime or to commence forfeiture proceedings against the Device and/or the data contained therein.

29.     The government will retain a forensic image of the Device for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

30.     *Manner of execution.*   Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

### Opinions

31.     Based on my training, experience, and discussions with other ICAC Investigators,

**Affidavit of Anthony Alcobia**                                                                 **Page 20**

I believe analysis of the device will reveal evidence of and/or victims of child exploitation and child pornography and/or evidence of attempted child exploitation.   I also know that there are certain characteristics common to individuals who have a sexual attraction to children, who may be looking to meet, communicate with, groom, entice, solicit, or travel to meet minors for the purpose of engaging in unlawful sexual contact.   Also, individuals who have a sexual attraction to children may be pursuing multiple victims, who may be in varying stages of victimization.

32.     Based on my training and experience and the facts contained in this affidavit, I believe TORRES, had he not been apprehended, and had MV1 been a real person rather than a decoy minor, would have engaged in sexual activity with an individual who had not attained the age of 18 years.

33.     I also know, based on my training and experience, that many current cellular telephones are basically small computers.   Many of them have the ability to send text messages, email messages, access the Internet, and to store mass quantities of information.   I know that many people use their phones as computers and it's feasible that a cellular telephone could have been used in this case to exploit other children.

**Conclusion**

34.     Based on the foregoing, I have probable cause to believe, and I do believe, that the Device described in Attachment A contains evidence, fruits, and instrumentalities of violations of 18 U.S.C § 2251(a) – Sexual Exploitation of Children and 18 U.S.C § 2422(b) – Coercion and Enticement of a Minor, as set forth in Attachment B.   I therefore request that the Court issue a warrant authorizing a search of the Device described in Attachment A for the items listed in Attachment B and the seizure and examination of any such items found.

**Affidavit of Anthony Alcobia**                                              **Page 21**

35.     Prior to being submitted to the Court, this affidavit, the accompanying application, and the requested search warrant were all reviewed by Special Assistant United States Attorney (SAUSA) Matthew Nelson and Assistant United States Attorney (AUSA) William M. McLaren.   I was informed that, in SAUSA Nelson's and AUSA McLaren's opinions, the affidavit and application are legally and factually sufficient to establish probable cause to support the issuance of the requested warrant.

*By phone pursuant to Fed. R. Crim. P. 4.1*
ANTHONY ALCOBIA
Special Agent HSI

Sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at

2:38 p.m._____ a.m./p.m. on December 6th_____, 2024.

*Andrew Hallman*
_____
HONORABLE ANDREW D. HALLMAN
United States Magistrate Judge

**Affidavit of Anthony Alcobia**                                                                **Page  22**

## ATTACHMENT A

### Property to Be Searched

The property to be searched is a White iPhone 12 mini with a clear and blue perimeter

case, bearing International Mobile Equipment Identity (IMEI) 353008113292516 and is

currently located on the premises of DCSO and DFL located at 63333 US-20, Bend, Oregon.



**Attachment A**

**ATTACHMENT B**

**Items to Be Seized**

1.      All records on the Device described in Attachment A that relate to violations of *18 U.S.C § 2251(a) – Sexual Exploitation of Children and 18 U.S.C § 2422(b) – Coercion and Enticement of a Minor* and involve Ernesto Perez TORRES since July 28, 2024 to the day of arrest on December 1, 2024, including:

a.      Any and all records, documents, or materials, including correspondence, that pertain to the production, possession, receipt, transportation, or distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

b.      Any records, documents, or materials, including correspondence, that pertain to any conversations with the Minor described in the affidavit in support of the search warrant application in any form including Facebook, or any other social media platform;

c.      Any records, documents, or materials, including any record related to the creation of or any correspondence to / from any Facebook account identified by the DCSO Deputy Dolan and/or HSI SA Alcobia described in the affidavit in support of the search warrant application in any form;

d.      Any records, documents, or materials, including any correspondence, that involve any communication with any person that appear to be coercive in nature for the purposes of grooming or obtaining images from any person;

e.      Any records, documents, or materials, including correspondence, that

**Attachment B**                                                                                    **Page 1**

pertain to the production, transportation, distribution, receipt, or possession of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256;

f.    All originals and copies of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256;

g.    Any motion pictures or digital video clips of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256; video recordings which are self-produced and pertain to sexually explicit images of minors; or video recordings of minors which may assist in the location of minor victims of child exploitation or child abuse;

h.    Any records, documents, or materials which include offers to transmit, through interstate commerce by any means (including by computer), any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256;

i.    Any records, documents, or materials relating to the production, reproduction, receipt, shipment, trade, purchase, or a transaction of any kind involving the transmission, through interstate commerce (including by computer), of any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256;

j.    Any records, documents, or materials naming or identifying minors visually depicted while engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256;

**Attachment B**                                                                                          **Page 2**

k.     Any records of Internet usage, including records containing screen names, usernames, and e-mail addresses, and identities assumed for the purposes of communication on the Internet on any app installed on the **Subject Device**.  These records include billing and subscriber records, chat room logs, e-mail messages, and include electronic files in a computer and on other data storage media, including CDs or DVDs;

l.     Any records, documents, or materials referring or pertaining to communications with others, whether in person, by telephone, or online, for the purpose of distributing or transporting child pornography, including chat logs, call logs, address book or contact list entries, digital images sent or received;

m.     Information or evidence of any websites visited, photographs, videos, images, reports, definitions, stories, books, music, lyrics, emails, videos, messages, and or notes associated with child pornography or those who collect, disseminate, or trade in child pornography; and

n.     Any records, documents, materials, videos, or photographs that would allow investigators to ascertain who used the **Subject Device**;

2.     As used above, the terms records, documents, programs, applications or materials includes records, documents, programs, applications or materials created, modified or stored in any form including digital or electronic form.

### Search Procedure

3.     The examination of the Device may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose

**Attachment B**                                                                                                 **Page 3**

many parts of the Device to human inspection in order to determine whether it is evidence described by the warrant.

4.      The initial examination of the Device will be performed within a reasonable amount of time not to exceed 120 days from the date of execution of the warrant.  If the government needs additional time to conduct this review, it may seek an extension of the time period from the Court within the original 120-day period from the date of execution of the warrant.  The government shall complete this review within 180 days of the date of execution of the warrant.  If the government needs additional time to complete this review, it may seek an extension of the time period from the Court.

5.      If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on the Device or image do not contain any data falling within the scope of the warrant, they will not search or examine those files or folders further without authorization from the Court.  Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file system, software application, etc., relating to files or data that fall within the scope of the warrant, through the conclusion of the case.

6.      If an examination is conducted, and it is determined that the Device does not contain any data falling within the ambit of the warrant, the government will return the Device to its owner within a reasonable period of time following the search and will seal any image of the Device, absent further authorization from the Court.

7.      If the Device contains evidence, fruits, contraband, or is an instrumentality of a crime, the government may retain the Device as evidence, fruits, contraband, or an

**Attachment B**                                                                                                  **Page 4**

instrumentality of a crime or to commence forfeiture proceedings against the Device and/or the data contained therein.

8.      The government will retain a forensic image of the Device for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

**Attachment B**                                                                                    **Page 5**